**STATE of Tennessee, Appellant,**

v.

**James Earl RAY, Appellee.**

Court of Criminal Appeals of Tennessee, at Jackson.

March 6, 1998.

### ORDER REQUIRING RECUSAL AND GRANTING STAY

In this extraordinary appeal, the State of Tennessee has requested this Court to (1) review the trial judge's Order denying the State's motion for recusal of the trial judge and (2) stay the trial court's Order which permits additional rifle testing. The State seeks recusal of the trial judge based upon (1) the trial judge's statements attacking the integrity of the Office of the District Attorney General and (2) the lack of impartiality of the tribunal. Appellee's request for oral argument is respectfully denied. The factual matters relating to the issues presented in the present appeal are undisputed. Oral argument would not assist in the determination of the legal issues presented by the parties. We grant the State's application for extraordinary appeal, finding that the State's position regarding the issue of recusal is well taken. Accordingly, the trial court's Order denying recusal is reversed.

### I.

In this court's Order dated August 29, 1997, we observed that a judge is a fair and impartial adjudicator and may not independently investigate facts in a case and must consider only the evidence presented. In this regard, we found that the trial judge had "engaged in a fact-finding mission beyond the scope of [his] authority." Examples of the trial court engaging in a fact-finding mission include, but are not limited to, the following:

By characterizing the court's responsibility as "a fact finding and not adversarial process ... relative to the question of whether or not the petitioner's rifle is or is not the murder weapon" (Order dated August 9, 1997, and filed August 11, 1997);

By criticizing the State as being "singularly opposed to vigorously proceeding to ascertain the true facts of this case" (Order filed August 11, 1997);

By forewarning of a need for the appointment of either a Master or Special Prosecutor to achieve a neutral, detached and vigorous pursuit of the facts in this case (Order filed August 11, 1997); and

By asserting in response to the State's objection regarding the court's line of questioning, "We're trying to get the facts ... I'm not going to allow the vicissitudes of somebody's artful cross-examination to keep me as a trier of fact from getting to the bottom of this. Overruled." (Judge Brown's statement in open court broadcast on *Prime Time Justice* on the Court TV Network on January 15, 1998).

Subsequent to the issuance of our Order of August 29, 1997, the trial judge stated the following:

"The eyes of the nation and the world are focused on the proceedings now before this court and the apparent sentiment is one of overwhelming and intense concern that truth and justice be allowed to manifest themselves without obstruction." (Order dated January 15, 1998, and filed on January 16, 1998).

■ Based upon the preceding examples included in the record before us, we find that the trial court has clearly exceeded its authority by engaging in and continuing to engage in a fact-finding mission. "A judge shall not be swayed by partisan interests, public clamor, or fear of criticism." Sup.Ct. Rule 10, Canon 3B(2). Although we do not question the well intended motive of the trial court in seeking to "[get] to the bottom of this," it is not the prerogative of the trial court to spearhead a fact-finding mission under the posture of this case.

## II.

The State argues that the trial court is biased against the District Attorney General and members of his staff. We find the following examples of the trial court's appearance of bias:

1. The trial court threatened the State with contempt of court for failing to file a "courtesy copy" of a motion with the judge. (Hearing on September 4, 1997);

2. The trial court, on Thursday, September 4, 1997, stated that it would rule on Friday, September 5, 1997, on the State's motion to recuse. In the event the trial judge denied the motion to recuse, the State would then file on Monday, September 8, 1997, an affidavit detailing proposed testimony in opposition to retesting the rifle. The trial court did not rule on the motion to recuse until January 16, 1998, and on the same date, issued an order allowing retesting. The State was deprived of an opportunity to be heard on retesting, despite the State's unequivocal and numerous requests at the September 4th hearing. (Hearing on September 4, 1997);

3. The trial court stated the following: "Now one thing you mentioned about the allegations of impropriety. One thing you should understand about this case. A lot of the shenanigans that you have observed have simply been due to local politics and power plays going on around and about the criminal courthouse and specifically involving a political action committee that is operating in the attorney general's office." (*Prime Time Justice* interview, broadcast on the Court TV Network on January 15, 1998, the day prior to the filing of the Order denying recusal and the Order allowing retesting);

4. The trial court noted "both the membership and leadership roles of certain of the State's representatives in this case with a political action committee (PAC) composed of assistant prosecutors in the Office of the District Attorney General for the Thirtieth Judicial District. Further, the intense public furor and debate over the merits of partisan election of the local judiciary for the first time ever in this jurisdiction contributed to a climate that found the non-partisanship of the court a likely target for such a campaign. The circumstance that a member of the PAC has announced that he will oppose the court in elections this year might be added to this equation." (Order dated January 15, 1998, and filed January 16, 1998); and

5. The trial court stated that "[his out of court] remarks addressed exclusively political matters and concerns that are perhaps exemplary of the evils foreseen as a consequence of partisan judicial elections were they to be permitted in Shelby County. It has developed in the interim that a local scandal of sorts involving allegations of attempted extortion and intimidation fol-

lowing from completely unfounded claims of partisan influence on the conduct of the Criminal Court Judiciary provided the final impetus to a successful effort by members of the Shelby County Commission to ban partisan elections of the judiciary." (Order dated January 15, 1998, and filed January 16, 1998).

Canon 3E(1)(a) of the Code of Judicial Conduct provides that a judge shall disqualify himself or herself when the judge has a personal bias toward a party or a party's lawyer. Based on the preceding examples, Judge Joseph B. Brown, Jr. has demonstrated in his orders, in open court, and in a television broadcast, the appearance of bias against the District Attorney General and members of his staff regarding this case.

■ Of equal and grave concern are the written findings by the trial court concerning matters of local politics. Our review of the record does not reveal any testimony or evidence whatsoever addressing these political matters. *Regardless of the conduct of the parties or counsel,* "[a] judge shall not allow ... political, or other relationships to influence the judge's judicial conduct or judgment." Sup.Ct.Rule 10, Canon 2B. Furthermore, "[a] judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." Sup.Ct.Rule 10, Canon 3B(7). A judge must consider only the evidence presented. Commentary, Sup.Ct.Rule 10, Canon 3B(7). The gratuitous interjection of political matters into these proceedings by the trial court was highly improper.

### III.

In the record are numerous articles from newspapers, such as *The Atlanta Journal Constitution, The Commercial Appeal,* and *The Tri–State Defender,* in which extra-judicial comments have been attributed to the trial judge. Included in these articles are the following, alleged to be attributable to Judge Brown:

1. Judge Brown stated in a telephone press interview that prosecutors want another judge because they fear Judge Brown is more likely to grant a new trial. *The Commercial Appeal,* April 18, 1997.

2. In response to the State's concern about Judge Brown placing himself in the chain of custody of the rifle, Judge Brown stated to a reporter, "They're full of it." Judge Brown denied that this would present a legal problem. *The Commercial Appeal,* April 18, 1997.

3. Prior to the filing of a ruling on rifle retesting, a newspaper reported:

Although Ray is still a long way from winning an actual trial, indications are that he will prevail at today's hearing, being held to determine whether to order a second batch of tests on the rifle officials say was used to kill King.

"What you have here is of great historical interest to this country," Criminal Court Judge Joe Brown said Thursday in a private interview in his chambers. "When a great man who tried to promote harmony, peace and freedom is assassinated, then the circumstances of that assassination are of paramount importance to the historical record and the moral and psychological nature of the nation. The public needs to be reassured that no stones are left unturned."

Although Brown would not comment on specifics, he used a medical analogy to explain why new tests could be warranted. A sick person, he said, may have a medical test that comes back inconclusive. But that doesn't mean that the doctor stops ordering other tests, Brown said. *The Atlanta Journal Constitution,* July 11, 1997.

4. Judge Brown released to a reporter an affidavit of indigency signed by Ray along with a bill from a firearms examiner. Judge Brown stated defense lawyers may ask the State to cover these costs. *The Commercial Appeal,* July 18, 1997.

5. Judge Brown stated in a press interview that he expected a "sneak attack from Republicans" and "went out of town intentionally just to see what they would do. They want to take me off this case because I'm vigorously trying to get to the bottom of it." Brown said, "in the scheme of things how would it look historically for a black judge to be taken off this case with

what it means to the black folks in this country and throughout the whole world and all fair minded people?" *The Tri–State Defender*, August 16–20, 1997.

6. "The State has not done what it ought to have done in terms of protecting the interest of all the people which in this non-adversarial but fact-finding situation we are in right now not attempting to assist in getting to the bottom of the thing," exclaimed Brown. "What you get to is a *political action committee which is Republican* in the attorney general's office—all of the prosecutors there are involved in this." As to the possibility of meeting with the presiding judge and another criminal court judge to resolve a jurisdictional dispute, "[they] are both Republicans," cited Brown. "How the hell does it look when it's recommended that a Republican resolve a dispute between a Democrat and a Republican?" he asked. *The Tri–State Defender*, August 16–20, 1997.

We find it unnecessary to address the above comments allegedly made to the media, with the exception of Judge Brown's statements on January 15, 1998, broadcast on *Prime Time Justice*, a program on the Court TV Network, which was included as an exhibit in this appeal and has been viewed by the members of this panel. We are reluctant to rely upon the various newspaper articles even though they too are a part of the record. If the statements in those articles accurately reflect the out of court comments of Judge Brown, the statements reinforce this court's conclusions of the appearance of bias against the State and the misperceived role of the trial court in this matter. If accurate, these statements may well be inappropriate comments concerning a pending proceeding. *See* Sup.Ct.Rule 10, Canon 3B(9). However, we choose not to rely upon them as we believe Judge Brown has not had an appropriate and full opportunity to address their accuracy.

### IV.

■ The issue of recusal is not to be decided simply by the judge's determination that the judge can be fair and impartial. Certainly, a judge should grant recusal whenever the judge has any doubts about his or her impartiality. *Alley v. State,* 882 S.W.2d 810, 820 (Tenn.Crim.App.1994). However, recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality. Id. at 820; Sup.Ct.Rule 10, Canon 3E(1); *see also State v. Cash,* 867 S.W.2d 741, 749 (Tenn. Crim.App.1993). In other words, the determining standard is an objective one, not a subjective one. *Alley,* 882 S.W.2d at 820. Courts must avoid the appearance of partiality as well as partiality itself. *Id.* at 823.

The oral and written statements of the trial judge clearly reflect that "the judge's impartiality might reasonably be questioned" based upon this objective standard. Sup.Ct. Rule 10, Canon 3E(1).

### V.

■ As we have previously noted, this case has been the subject of extensive appellate review in both the state and federal courts. In this regard, we recognize that the Tennessee Supreme Court and the Sixth Circuit Court of Appeals have concluded that Ray's guilty plea of March 10, 1969, was voluntarily and knowingly entered.[1] The judgment of conviction has been final for almost twenty-nine years. That is the legal posture of this matter presently pending in the Criminal Court of Shelby County. Under our law a presumption of finality and legality attaches to the conviction and sentence, *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3391–92, 77 L.Ed.2d 1090 (1983).

It is imperative to place this matter in its proper legal perspective. It is undisputed that Dr. Martin Luther King, Jr. remains a national hero who personified that which is perceived as good and noble. However, this is not the issue before the courts.

The function of judges is to determine controversies.... They are not adjuncts or

---

1. *Ray v. Rose,* 535 F.2d 966 (6th Cir.1976), *cert. denied,* 429 U.S. 1026, 97 S.Ct. 648, 50 L.Ed.2d 629 (1976); *Ray v. State,* 224 Tenn. 164, 451 S.W.2d 854 (Tenn.), *reh'g denied,* (1970).

advisors, much less investigating instrumentalities.... The judge is ... [not] a prosecutor ... He is [not] to follow trails of suspicion, to uncover hidden wrongs, to build up a case as a prosecutor builds one ...

*State v. Cash,* 867 S.W.2d at 749.

### VI.

Because Judge Joseph B. Brown, Jr. has engaged in and continues to engage in a fact-finding mission and has demonstrated the appearance of bias against the District Attorney General and members of his staff, recusal is warranted. Therefore, the Order of the trial court denying recusal is reversed. We conclude that Judge Joseph B. Brown, Jr. of Division IX of the Shelby County Criminal Court is prohibited from any further participation in any proceedings regarding James Earl Ray. The Presiding Judge of the Thirtieth Judicial District shall assign this case to another judge pursuant to Rule 11, Section III(a) of the Rules of the Supreme Court. For clarity, the Presiding Judge of the Thirtieth Judicial District is not the Administrative Judge of the Criminal Court of Shelby County.

### VII.

The State also seeks a stay of the trial court's Order authorizing further testing of the rifle. In this court's Order of February 3, 1998, we granted a stay of any further testing of the rifle pending further orders from this Court. When this case is assigned to another judge by the Presiding Judge of the Thirtieth Judicial District, the State is to be afforded a hearing regarding retesting of the rifle, consistent with this Court's Order filed April 9, 1997, 984 S.W.2d 236.

### CONCLUSION

In summary, we conclude:

1. Judge Joseph B. Brown, Jr. of Division IX of the Shelby County Criminal Court is prohibited from participating in any further proceedings regarding James Earl Ray.

2. The Presiding Judge of the Thirtieth Judicial District is to assign this case to another judge, pursuant to Rule 11, Section III(a) of the Rules of the Supreme Court.

3. Upon reassignment to another judge, the State is to be afforded a hearing regarding any retesting of the rifle.

IT IS SO ORDERED.

/s/ Paul G. Summers
Paul G. Summers, Judge

/s/ David G. Hayes
David G. Hayes, Judge

/s/ Joe G. Riley
Joe G. Riley, Judge